

RECIEVED
UNION CORRECTIONAL INSTITUTION
JAN 24 2023
BY: FOR MAILING

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

42 U.S.C. §1983 CIVIL RIGHTS COMPLAINT
WITH DEMAND FOR JURY TRIAL

## FIRST AMENDED COMPLAINT

VALERY RUKAVISHNIKOV,
    Plaintiff,

v.                                          CASE NO: 3:23-CV-898-MMH—PDB

FLORIDA DEPARTMENT OF
CORRECTIONS (F.D.O.C.) and
ITS CONTRACTORS,
    Defendants.

_____/

2023 JAN 26 PM 1:05
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

FILED

# COMPLAINT

1

## COMPLAINT

Plaintiff Valery Rukavishnikov, hereby sue Florida Department of Corrections (F.D.O.C.) and its Contractors, and alleges as follows:

## (INTRODUCTION)

1. This is a Civil Rights action for monetary damages. Plaintiff is an inmate incarcerated in F.D.O.C.'s prison system. Plaintiff is suing Defendants for deliberately denying, and then delaying medically necessary treatment for Chronic Hepatitis-C. In addition, these Defendants are not providing medical relief / care for complications and irreparable health damages as a result of the long delay in treatment.

Specifically, Plaintiff sue Defendants in violation of Eighth Amendment and for intentionally discrimination against him on the basis of disability in violation of the American With Disabilities Act (ADA) and the Rehabilitation Act (RA).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claim asserted herein pursuant to 28 U.S.C. §1331 in that this is a Civil Action arising under the U.S. Constitution.

3. Venue is proper in the Middle District of Florida, Jacksonville Division, as Defendant F.D.O.C. and its Contractors are headquartered with its principle place of business in Tallahassee, Florida and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Middle District of Florida. See 28 U.S.C. §1391.

2

4. The claims alleged herein are brought within the applicable statute of limitations.

5. Plaintiff has complied with all conditions precedent and has fully and properly exhausted all available administrative remedies prior filing this action.

## THE PARTIES

6. Plaintiff is an inmate incarcerated in Defendant F.D.O.C.'s prison system who has been incarcerated within F.D.O.C. since 1993. Throughout his incarceration, Plaintiff has suffered from denial and delay of Hepatitis-C treatment, at numerous prisons operated by Defendant F.D.O.C., and staffed with medical personnel either from Wexford, Corizon and or Centurion Health Care.

7. Defendant F.D.O.C. is an agency of the State of Florida that operates correctional institutions throughout the State of Florida, where Plaintiff has been or is currently housed, where the department denied and delayed treatment for his Hepatitis-C during incarceration, that receives federal funding for use in operation its home office and individual institutions.

8. Defendant F.D.O.C. is headquartered in Tallahassee, Florida. Defendant F.D.O.C. is responsible for providing medical care of all individuals confined in its prison system.

9. F.D.O.C. is responsible for overseeing the operations of its medical contractors. F.D.O.C. discriminated against Plaintiff—a qualified individual with a disability due to his infection with chronic HCV—by deliberately deriving him of medically necessary treatment for his chronic HCV.

10. At times herein, F.D.O.C. and its contract health care providers had a non-delegable duty to provide constitutionally-adequate medical care to all prisoners in Florida.

3

# FACTS

## Background Information on Hepatitis-C

11. Hepatitis-C is a blood borne disease caused by Hepatitis-C virus (HCV). The virus causes inflammation that damages liver cells and is a leading cause of liver disease and liver transplants.

12. HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure.

13. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty (50) to eighty (80) percent of infected people will develop chronic HCV.

14. Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infections, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

15. People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to liver failure and hepatocellular carcinoma (liver cancer).

16. The amount of liver scarring a patient has is usually measured on the METAVIR scale. On this scale, a person can be classified F0 (no fibrosis). F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis).

4

17. Among those with chronic HCV, the majority will develop progression liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe. Patients with rapid fibrosis liver progression may reach cirrhosis within as short a timeframe as one year.

18. Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

19. Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

20. Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may be too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

21. Chronic HCV is, a matter of law, a serious medical need. See <u>Mitchell v. Nobles,</u> 878 F. 3d 869, 876 (11th Cir. 2017).

22. Plaintiff's disabling condition was chronic HCV. In other words, Plaintiff's disability was chronic HCV, as defined under the ADA and RA.

5

## General Prevalence of HCV

23. Approximately 2.7 to 3.9 million Americans have chronic HCV.

24. In 2000, the United States Surgeon General called HCV a silent epidemic, and estimated that as much as two percent of the adult U.S. population has HCV.

25. In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

26. Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

27. HCV is the leading indication for liver transplants in the United States.

## HCV in Prison

28. The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

29. F.D.O.C. has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendants listed 4,797 inmates as having HCV in its internal records. As of late-2017, it was estimated that F.D.O.C. had acknowledged of at least 7,000 inmates who were infected with HCV.

30. In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 F.D.O.C. inmates have HCV. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

6

## Standard of Care for HCV

31. For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other diseases.

32. In 2011, however, the Food and Drug Administration (FDA) began approving new oral medications, called direct-acting antiviral (DAA) drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

33. As of late-2013, DAA drugs became available for HCV patients.

34. These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injection. They have truly revolutionized the way HCV is treated.

35. Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

36. For HCV, a cure is defined as a sustained virologic response (SVR) – *i.e.* no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

7

37. In response to the revolutionary DAA medications, the American Association for the study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hevguidelines.org.

38. The HCV Guidance set forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

39. In 2014, the AASLD / IDSA panel, through the HCV Guidance, recommended treatment with DAA drugs for all persons with chronic HCV. The recommendation reflected the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

40. Treatment with DAA drugs has been the standard of care for the treatment of HCV since 2014.

41. Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

42. Plaintiff did not know about the availability DAA treatment until after Defendants were ordered to provide the necessary treatment based on the Hoffer decision. Plaintiff contends that Defendants actively concealed this information and continually denied him treatment.

43. The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

8

44. Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

## Public Health Benefits of Treatment in Prison

45. Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

46. Studies have shown that providing DAA treatment to everyone with chronic HVC increases long term cost-savings. One study even found that restricting DAA treating access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAA's, over the course of treatment, the follow-up care outweighs the initial costs.

47. Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

## F.D.O.C.'s Statewide Policy and Practice of Not Providing Treatment To Inmates with Chronic HCV

48. From late 2013, when DAA's first became available, until approximately October of 2017, Defendant F.D.O.C. had a policy and practice of refusing to provide treatment for chronic HCV.

9

49. Defendant F.D.O.C. enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant F.D.O.C. has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of inmates infected with HCV, including the Plaintiff.

50. Despite knowing that DAA's were the standard of care for the treatment of chronic HCV since 2014, Defendant F.D.O.C. and its medical contractors— including Wexford, Corizon and Centurion—failed and / or refused to provide DAA's to Plaintiff and thousands of other, HCV-infected inmates throughout the state, in contravention of the prevailing standard of care and with deliberate indifference to the serious medical needs of inmates with chronic HCV in Florida.

51. This policy of refusing to treat HCV was implemented because of the cost of treatment.

52. It was not until F.D.O.C. was court-ordered[1] to begin providing DAA's to HCV-infected inmates that Plaintiff and thousands of other inmates received medically necessary treatment for their chronic HCV.

53. As a result of F.D.O.C.'s failure and / or refusal to provide DAA drugs, over 100 inmates died of untreated HCV and hundreds more suffered irreparable liver damage.

54. Defendants' also unjustifiably delayed providing treatment to HCV-infected inmates, even though the standard of care requires treatment as early as possible. If treatment is delayed until a patient develops decompensated cirrhosis, a liver transplant may provide the only cure.

---

[1] See <u>Hoffer v. Jones</u>, 290 F. Supp. 3d 1292 (N.D. Fla. 2017) (granting preliminary injunction; see also <u>Hoffer v. Inch</u>, 382 F. Supp. 3d 1288 (N.D. Fla. 2019) (granting permanent injunction.

55. At all times relevant hereto, Defendants Corizon, Centurion and F.D.O.C. categorically withheld treatment from F.D.O.C. inmates with HCV but did not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

56. Defendants' had a policy under which inmates with chronic HCV were not provided lifesaving medications for their serious medical need and disability, while inmates with other medical needs and disabilities had access to lifesaving medications.

57. Defendants' refused to provide F.D.O.C. inmates, including Plaintiff, with the necessary treatment for their HCV, and the only treatment recommended under the prevailing standard of care, because of the cost of the treatment.

## Defendant F.D.O.C. Deliberately Deprived Plaintiff of Medically Necessary Treatment for His Chronic HCV

58. Plaintiff has been incarcerated in the Florida prison system since 1993. He has a history of HCV since approximately 1999, when he was diagnosed by F.D.O.C. medical staff at Hendry Correctional. Plaintiff was subsequently referred to the Chronic Illness Clinic for his chronic HCV for monitoring.

59. Throughout his incarceration, Plaintiff regularly inquired about the condition of his liver and requested treatment for his HCV. All of Plaintiff's requests were denied. Moreover, Plaintiff was not adequately informed of the severity of his liver disease and the substantial health risk associated with chronic HCV.

60. From December, 2013 until August of 2018, Plaintiff was only given routine blood draws to monitor his HCV. He was not provided DAA's or any other

11

treatment for HCV even though treatment with DAA's was required under the standard of care since 2014.

61. DAA medications were available to Defendant's upon request.

62. Defendant's did not recommend, request, or provide DAA drugs to Plaintiff until August of 2018, notably after F.D.O.C. was sued in federal court in Hoffer and ordered to provide DAA treatment to Plaintiff.

63. Whether an F.D.O.C. inmate receives DAA treatment almost exclusively relies on the inmates' METAVIR or fibrosis score (F0-F4). Under F.D.O.C.'s guidelines, inmates are then prioritized for treatment based on their fibrosis score, which reflects the stage and progression of their liver disease. Nonetheless, until December of 2017, Defendant's failed to require or perform the necessary tests to determine the stage and progression of Plaintiff's HCV, and thus, whether Plaintiff truly met the criteria for treatment under F.D.O.C.'s guidelines.

64. It was not until December of 2017 – more than eighteen years after F.D.O.C. initially diagnosed him with HV-that Plaintiff was given a FibroSure test to determine his fibrosis score.

65. The results show a fibrosis score of F3+ borderline F4, thus indicating that Plaintiff had advanced fibrosis. In fact, F.D.O.C. was well-aware of this fact, as demonstrated by the fact that Plaintiff's medical records throughout his incarceration are replete with documentation of Plaintiff's HCV and his worsening liver function.

66. In particular, Plaintiff's medical records clearly document the fact that Plaintiff suffered from life-threatening advanced fibrosis of the liver, as well as other countless serious and severe resultant, related, and / or associated medical conditions and effects, including without limitations, severe fibrosis, significant or severe liver inflammation activity, abnormal blood AST and ALT levels and blood platelet count, persistent and extreme fatigue and low energy, increased muscle

12

weakness, joint pain, dizziness, abdominal discomfort and distension, poor appetite, and nausea, beginning prior to 2013 and persisting throughout his incarceration, making DAA's a necessity and within the standard of care for Plaintiff as early as December of 2013. Despite Plaintiff's clinical presentation, no DAA treatment was provided to Plaintiff at that time, or in the months and years thereafter.

67. For years Plaintiff was led to believe by contract health care personnel that he was on the list to be treated.

68. However, the health are contractor Defendants refused and / or failed to provide treatment to Plaintiff from December, 2013 through September of 2018, in part to save costs and increase profits.

69. Treatment was only provided to Plaintiff after the Court in Hoffer ordered F.D.O.C. to begin providing DAA treatment to HCV-infected inmates. There was no medical reason or justification for the failure to provide Plaintiff with DAA's prior to his ultimate date of treatment.

70. Throughout his incarceration, Plaintiff during every encounter with medical staff specifically requested medial treatment for his HCV. Some doctors stated there was no cure.

71. When Plaintiff requested treatment with Interferon, the department and contract health care providers stated Interferon is an imperfect cure.

72. In fact, Plaintiff was told that he did not qualify for treatment under F.D.O.C.'s treatment guidelines.

73. Instead, of treatment Plaintiff's medical providers merely continued to monitor Plaintiff's HCV from 1999 through August of 2018.

74. Plaintiff repeatedly requested an accommodation for his chronic, serious, severe, and life-threatening HCV-that is, treatment which could result in a cure for his disability.

13

75. This request for DAA treatment was a request for a reasonable accommodation in that DAA drugs are the only recommended form of treatment capable of clearing HCV from Plaintiff's body.

76. Nonetheless, F.D.O.C. and contract health care providers failed to recommend, request, or provide Plaintiff with such treatment until August of 2018.

77. Plaintiff's request for DAA drugs as treatment for HCV was a reasonable request for a reasonable accommodation, as F.D.O.C. is required to provide such medication as treatment for HCV under both the standard of are since 2014 and the United States Constitution.

78. Despite Plaintiff's HCV-diagnosis, serious abnormal and life-threatening HCV-related conditions, symptoms, and repeat4ed requests for treatment, Plaintiff was not provided DAA treatment until August of 2018.

79. Plaintiff should have received treatment with DAA drugs as early as in December of 2013, in accordance with the prevailing standard of Hepatitis-C medical care.

80. From the outset of when DAA's became the standard of care in 2013 / 2014, Plaintiff suffered from well-known, well-documented, serious, severe, and life-threatening advanced fibrosis of the liver, and other serious complications associated with advanced fibrosis, due to Defendants' refusal and delay in providing treatment for his HCV.

81. Plaintiff has suffered and continues to suffer from a variety of symptoms directly caused by or associated with HCV including, but not limited to, persistent and extreme fatigue and low energy, increased muscle weakness, dizziness, joint pain, abdominal discomfort and distension, poor appetite, and nausea.

82. In fact, some days Plaintiff is unable to muster up enough strength to get out of bed.

14

83. Plaintiff has also suffered and continues to suffer from a variety of symptoms or conditions indirectly caused by or associated with HCV including, but not limited to abnormal fibrosis, significant or severe liver pain and inflammation activity, mental confusion, disorientation and depression.

84. Plaintiff was denied DAA treatment for his chronic HCV because F.D.O.C. and contract health care providers had a statewide policy and practice of not providing DAA drugs to HCV inmates.

85. This policy and practice was implemented for non-medical reasons, including, *inter alia*, the cost of the treatment.

86. In other words, Defendants' refused to provide DAA treatment for non-medical reasons constituted a deliberate indifference towards Plaintiff and his serious medical need and disability.

87. By being denied access to DAA treatment for his HCV by the Defendant health care contractors and F.D.O.C., Plaintiff was denied meaningful access to prison programs, services, and activities, including access to medical services.

88. The irreparable damage suffered by Plaintiff may have been prevented if not for Defendants' unconstitutional denial and delay of treatment for HCV. Plaintiff continues to suffer damages as a result of defendant's deliberate indifference to his serious medical need and disability.

89. As a result Plaintiff has suffered serious, substantial, life-threatening, and permanent injuries, including irreparable liver damage, as a result of Defendant's failure to provide him necessary medical care and treatment for his chronic HCV.

15

# VI. STATEMENT OF CLAIMS

## COUNT 1

## TITLE II OF THE AMERICAN'S WITH DISABILITIES ACT (ADA)
### (Against all Named Defendants and this Lawsuit)

90. Plaintiff incorporates and re-alleges paragraphs 1 through 88 as if fully set forth herein.

91. This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§12131-12134, and it implementing regulations.

92. The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131-12134; see also 28 C.F.R. §§35.130. In other words, the ADA imposes an affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

93. Defendant F.D.O.C. is a public entity within the meaning of 42 U.S.C. §12131(1) AND 28 C.F.R. §35.104.

94. Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. §12102(1) & (2); 28 C.F.R. §35.108(a) & (b).

95. This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular,

1inmate '23/1/19 AC75011000716 40762

and hemic systems; and the operation of the liver. 42 U.S.C. §12102(2); 28 C.F.R. §35.108(c).

96. In other words, Plaintiff's chronic HCV caused him to have a disability as defined under the ADA. Stated differently, Plaintiff's disability was chronic HCV.

97. Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. §12102(1)(B); 28 C.F.R. §35.108(a)(1)(ii) & (c).

98. Plaintiff  is regarded by F.D.O.C. as having an impairment that substantially limits one or more major life activity, as such F.D.O.C. perceives him as having an impairment.

99. 42 U.S.C. §12101(1)(C) & (3);  28 C.F.R. §35.108(a)(1)(ii) & (f). Defendants F.D.O.C. Wexford, Corizon and Centurion have subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

100. Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant F.D.O.C., including but not limited to medical services. 42 U.S.C. §12131(2); 28 C.F.R. §35.104.

101. By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant F.D.O.C. excluded Plaintiff from participation in, and denied him the benefits of, F.D.O.C. services, programs and activities (such as medical services) by reason of his disability.  42 U.S.C. §12132;  28 C.F.R. §35.130(a).

102. By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are

17

not disabled, Defendant F.D.O.C. subjected Plaintiff to discrimination. 42 U.S.C. §12132; 29 C.F.R. §35.130(a).

103. DAA's are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment.

104. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing DAA treatment to Plaintiff,   Defendant F.D.O.C. refused or failed to provide Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

105. Defendant F.D.O.C. failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. §35.130(b)(1).

106. Defendant F.D.O.C. utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. §35.130(b)(3).

107. DAA's were readily available to Defendants during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

108. Defendant F.D.O.C. denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

109. Defendant F.D.O.C. knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to:

(a) F.D.O.C's decision to adopt and enforce a policy of not providing treatment to HCV-infected inmates;

18

(b) F.D.O.C.'s refusal to provide Plaintiff with necessary medical treatment for his HCV, and the only treatment available under the prevailing standard care;

(c) F.D.O.C.'s refusal to provide Plaintiff with DAA drugs because of the high, unbudgeted cost of the treatment; and

(d) To the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAA's, F.D.O.C.'s refusal or failure to even request adequate funding from the Florida Legislature.

110. Had Defendant F.D.O.C. not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested throughout his incarceration, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

111. Defendant F.D.O.C. owed Plaintiff a non-delegable duty to ensure that he wellbeing would not be compromised as a result of discrimination based on his disability.

112. As such, Defendant F.D.O.C. is vicariously liable for the actions of any and all persons or entities Defendant F.D.O.C. contracted out its medical services to or otherwise designated to care for Plaintiff.

113. As a direct and proximate cause of Defendant F.D.O.C.'s actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, Plaintiff demands judgment against Defendant's named herein for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT II

## SECTION 504 OF THE REHABILITATION ACT (RSA)
### (Against All Named Defendants of this Lawsuit)

114. Plaintiff incorporates and re-alleges paragraphs 1 through 112 as if fully set forth herein.

115. This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. §701, *et. seq.* and 29 U.S.C. §791-794, *et. seq.,* and its implementing regulations.

116. Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. §794(a0.

117. Defendant F.D.O.C. is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. §794.

118. Defendant F.D.O.C. excluded Plaintiff-a qualified individual with a disability-from participation in, and denied him the benefit of, programs or activities solely by reason of his disability (chronic HCV). 29 U.S.C. §794(a); 29 U.S.C. §705(20); 28 C.F.R. §794(a).

119. Defendant F.D.O.C. subjected Plaintiff – a qualified individual with a disability – to discrimination. 29 U.S.C. §794(a).

120. Defendant F.D.O.C. denied Plaintiff – a qualified handicapped person-the opportunity accorded to others to participate in programs and activities. 28 C.F.R.

121. Defendant F.D.O.C. utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of F.D.O.C.'s programs or activities with respect to handicapped persons. 28 C.F.R.  42.503(b)(3).

20

122. As a direct and proximate cause of Defendant F.D.O.C.'s exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, Plaintiff demands judgment against Defendants' named herein for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

Based on claims advanced in Plaintiff's complaint Plaintiff claims that Defendants violated the Eighth Amendment, ADA, and RA. As relief Plaintiff requests a declaration that Defendants violated his rights, as well as compensatory and punitive damages.

## COST OF LITIGATION

Plaintiff seeks attorney's fees, costs, and litigation expenses.

Respectfully submitted,

/s/ _____

Valery Rukavishnikov F.D.O.C.#193920
Union Correctional Institution
P. O. Box 1000
Raiford, Florida 32083

21

## OATH

I DECLARE under penalty of perjury that I have read the above and that the foregoing statements of fact, including any continuation pages are true and correct.

/s/ _____

Valery Rukavishnikov  F.D.O.C.#193920

22

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing (FIRST AMENDED) 42 U.S.C. §1983 Civil Rights Complaint, was turned over to prison officials to be mailed by First-class U.S. Mail to the addresses below:

On this $\underline{24}$ day of $\underline{January}$, 2023.


To:   HONORABLE CLERK OF COURTHOUSE
      U.S. MIDDLE DISTRICT
      300 NORTH HOGAN STREET
      JACKSONVILLE, FLORIDA 32202

And to:
      JACOB B. HANSON (Fla. Bar. No: G1453)
      Attorney for Defendant: CENTURION OF FLORIDA LLC.,
      BRADLEY ARANT BOULT COMMINGS LLP
      100 NORTH TAMPA STREET
      SUITE 2200
      TAMPA, FLORIDA 33602


/s/ _____

Valery Rukavishnikov  F.D.O.C.#193920
Union Correctional Institution
P. O. Box 1000
Raiford, Florida 32083

**RECIEVED**
UNION CORRECTIONAL INSTITUTION

JAN 2 4 2023

BY:_____
   FOR MAILING

23